UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GRACE SCHOOLS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:12-CV-459 JD |
| | ) | |
| KATHLEEN SEBELIUS, in her official capacity | ) | |
| as Secretary of the U.S. Department of Health and | ) | |
| Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

<u>Memorandum Opinion and Order</u>

Plaintiffs Grace Schools (hereinafter, "Grace") and Biola University, Inc. (hereinafter,

"Biola") have filed their first amended verified complaint [DE 54] seeking declaratory and

injunctive relief claiming that the government defendants have violated their rights under the

Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb *et seq.*, the First

Amendment of the Constitution of the United States, and the Administrative Procedure Act, 5

U.S.C. § 500 *et seq.*, by enacting the "contraception mandate" which requires certain employers

to provide coverage for contraception and sterilization procedures in their employee health care

plans on a no-cost-sharing basis, or face stiff financial penalties and the risk of enforcement

actions for the failure to do so. Although the defendants have since moved to dismiss the

amended complaint and the parties have sought summary judgment on the various claims

presented [DE 60; DE 69], the Court focuses only on plaintiffs' request for injunctive relief and

defendants' objection thereto,[1] in an effort to prevent the possibility of any unjust enforcement of

_____

[1]The Court previously advised the parties as to how this complex litigation would
proceed [DE 57] and the parties have filed their briefs consistent with the Court's scheduling
order [DE 52]. The Court has also carefully considered the supplemental notices of authority

the contraception mandate against plaintiffs come the first of the year.[2]

For the reasons that follow, plaintiffs have shown that their RFRA claim stands a reasonable likelihood of success on the merits, that irreparable harm will result without adequate remedy absent an injunction, and that the balance of harms favor protecting the religious-liberty rights of the plaintiffs.  As such, the Court enters a preliminary injunction barring enforcement of the contraception mandate against Grace and Biola.

## I.  Background

### *The Contraception Mandate*

Under the Patient Protection and Affordable Care Act (ACA), employment-based group health plans covered by the Employee Retirement Income Security Act must provide certain types of preventive health services. *See* 42 U.S.C. § 300gg–13; 29 U.S.C. § 1185d. One provision mandates coverage, without cost-sharing by plan participants or beneficiaries, of "preventive care and screenings" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]." 42 U.S.C. § 300gg–13(a)(4).  The HRSA, an agency of the U.S. Department of Health and Human Services (HHS), then delegated the task of developing appropriate preventive-services guidelines to the Institute of Medicine (IOM), an arm of the National Academy of Sciences funded by Congress to provide the government with independent expert advice on matters of public health.  After

and responses filed by counsel, along with the amicus curiae briefs filed by counsel for the Liberty, Life and Law Foundation, the American Civil Liberties Union, the American Center for Law & Justice, and Regent University.

[2]Grace's employee health care plan begins on January 1, 2014, while Biola's employee health care plan begins shortly thereafter on April 1, 2014 [DE 54 at ¶ 179], and their student plans begin in the Summer of 2014. *Id*. at ¶ 181.

reviewing the type of preventive services necessary for women's health and well-being, the IOM recommended that the following preventive services be required for coverage: annual well-woman visits; screening for gestational diabetes and breast-feeding support, supplies, and counseling; human papillomavirus screening; screening and counseling for sexually transmitted infections and human immune-deficiency virus; screening and counseling for interpersonal and domestic violence; and contraceptive education, methods, and services so that women can better avoid unwanted pregnancies and space their pregnancies to promote optimal birth outcomes. *See* IOM, Clinical Preventive Services for Women: Closing the Gaps, http://www.iom.edu/Reports/ 2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx (last visited Dec. 9, 2013). Based on the IOM's recommendations, the HRSA issued comprehensive guidelines requiring coverage of (among other things) "[a]ll Food and Drug Administration [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling[3] for all women with reproductive capacity." HRSA, Women's Preventive Services Guidelines: Affordable Care Act Expands Prevention Coverage for Women's Health and Well–Being, http://www.hrsa.gov/womensguidelines/ (last visited Dec. 9, 2013). These include hormonal methods such as oral contraceptives (the pill), implants and injections, barrier methods, intrauterine devices, and emergency oral contraceptives (Plan B and Ella).[4] *See* FDA, Birth

---

[3]The defendants clarify that this requirement does not indicate that such education and counseling need necessarily be 'in support of' certain contraception services or contraception in general.

[4]As the government points out, the list of FDA approved contraceptive methods does not include abortion, however, the terms "abortifacients" or "abortion inducing drugs" as used throughout this opinion refers to plaintiffs' characterization of contraception that artificially interferes with life and conception in violation of their religious beliefs.

Control: Medicines To Help You, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/
FreePublications/ucm313215.htm (lasted visited Dec. 9, 2013). On February 15, 2012, HHS
published final regulations incorporating the HRSA guidelines. 77 Fed. Reg. 8725 (Feb. 15,
2012). The agency made the mandate effective in the first plan year on or after August 1, 2012,
*see* 45 C.F.R. § 147.130(b)(1), however, a temporary enforcement safe harbor for nonexempt
nonprofit religious organizations that objected to covering contraceptive services was also
created, making the mandate effective in the first plan year on or after August 1, 2013 for those
qualifying organizations who did not meet the religious employer exemption. 77 Fed. Reg. 8728-
29. The government then undertook new rulemaking during the safe harbor period to adopt new
regulations applicable to non-grandfathered[5] nonprofit religious organizations with religious
objections to covering contraceptive services. *Id.*

On March 21, 2012, the government issued an Advance Notice of Proposed Rulemaking
that stated it was part of the government's effort "to develop alternative ways of providing
contraceptive coverage without cost sharing in order to accommodate non-exempt, nonprofit
religious organizations with religious objections to such coverage." 77 Fed. Reg. 16,501, 16,503
(Mar. 21, 2012). On February 1, 2013, the government issued a Notice of Proposed Rulemaking
(NPRM), setting forth a proposal that stated it was to "amend the criteria for the religious
employer exemption to ensure that an otherwise exempt employer plan is not disqualified

---

[5]"Grandfathered" plans are those health plans that do not need to comply with the ACA's
coverage requirements because they were in existence when the ACA was adopted and did not
make certain changes to the terms of the plan. 42 U.S.C. § 18011. The purpose of
grandfathering plans was to allow individuals to maintain their current health insurance plan, to
reduce short term disruptions in the market, and to ease the transition to market reforms that
phase in over time. *See* 75 Fed. Reg.. 34,546 (June 17, 2010). The number of grandfathered plans
is expected to decline over time.

because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths," and to "establish accommodations for health coverage established or maintained by eligible organizations, or arranged by eligible organizations that are religious institutions of higher education, with religious objections to contraceptive coverage." *See* 78 Fed. Reg. 8456 (Feb. 6, 2013). On June 28, 2013, the government issued final rules adopting and/or modifying the proposals in the NPRM. *See* 78 Fed. Reg. 39,870. The regulations challenged here (the "final rules") include the new regulations issued by the government and applicable to non-grandfathered, nonprofit religious organizations with religious objections to covering contraceptive services. *See* 78 Fed. Reg. 39,870.

The final rules state that they "simplify[ied] and clarify[ied]" the definition of "religious employer." 78 Fed. Reg. 39,871. Under the new definition, an exempt "religious employer" is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended. 78 Fed. Reg. 39,874 (codified at 45 C.F.R. § 147.131(a)). The groups that are "refer[red] to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code," are "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i), (iii). The new definition of "religious employer" does "not expand the universe of religious employers that qualify for the exemption beyond that which was intended in the 2012 final regulations." 78 Fed. Reg. 39,874 (citing 78 Fed. Reg. 8461). The 2013 final rules' amendments to the religious employer exemption apply to group health plans and group health insurance issuers for plan years beginning on or after

August 1, 2013. *See id.* at 39,871.

The 2013 final rules also included an "accommodation" regarding the contraceptive coverage requirement for group health plans, as well as student health plans, established or maintained by "eligible organizations." 78 Fed. Reg. 39,874–80; 45 C.F.R. § 147.131(b)-(f).  An "eligible organization" is an organization that satisfies the following criteria:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b); *see also* 78 Fed. Reg. 39,874-75. The 2013 final rules state that an eligible organization is not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections. 78 Fed. Reg. 39,874.  To be relieved of the obligations that otherwise apply to non-grandfathered, nonexempt employers, the 2013 final rules require that an eligible organization complete a self certification form, certifying that it is an eligible organization, sign the form, and provide a copy of that self-certification to its issuer or third party administrator (TPA). *Id*. at 39,878–79  In the case of an organization with an insured group health insurance issuer, upon receipt of the self certification, the organization's health insurance issuer must provide separate payments to plan participants and beneficiaries for contraceptive services without cost sharing, premium, fee, or other charge to plan participants or

6

beneficiaries, or to the eligible organization or it's plan. *Id*. at 39,875–77. The government expects that its insurers will have options to achieve cost neutrality, including by way of cost savings from improvements in women's health and fewer pregnancies, and by including the cost of contraceptive services as an administrative cost that is spread across the issuer's entire risk pool (excluding plans established or maintained by eligible organizations). *Id*. at 39,877-78. In the case of an organization with a self-insured group health plan, upon receipt of the self certification, the organization's TPA is designated as plan administrator and claims administrator for purposes of providing or arranging separate payments for contraceptive services without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or it's plan. *Id*. at 39,879–80. Under the 2013 final rules, costs incurred by TPAs relating to the coverage of contraception services for employees and students of eligible organizations can be reimbursed through an adjustment to Federally-Facilitated Exchange user fees. *See* 78 Fed. Reg. 39,880. The contraceptive services provided are directly tied to the employer's insurance policy, and are available only so long as the employees/students are enrolled in the organization's health plan. 45 C.F.R. § 147.131(c). The 2013 final rules' "accommodation" applies to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014. 78 Fed. Reg. 39,872.

Ultimately, several exemptions from the ACA's coverage requirements have survived the law's revisions, including exemptions for smaller employers—those with fewer than fifty full time employees, 26 U.S.C. § 4980H, and employer health plans that are grandfathered, 42 U.S.C. § 18011. In addition, religious employers meeting the narrow definition of religious employer are exempted from the contraceptive coverage requirement. 45 C.F.R. § 147.131(a). A

noncomplying employer who does not meet an exemption will face large fines, specifically, $2,000 per year per full time employee (less 30 employees) for not providing insurance meeting the coverage requirements, 26 U.S.C. § 4980H(c), or $100 per day per employee for providing insurance that excludes the coverage required by the contraception mandate, 26 U.S.C. § 4980D, and will face the risk of other enforcement actions.

As detailed below, Grace and Biola do not meet any of these exemptions; rather, they meet the "accommodation" created for nonprofit religiously affiliated employers, which the Seventh Circuit has characterized as "an attempted workaround whereby the objecting employer gives notice to its insurance carrier and the insurer issues a separate policy with the mandated coverage." *Korte v. Sebelius*, 735 F.3d 654, 662 (7th Cir. 2013) (Rovner, J., dissenting). The plaintiffs argue that compliance with the contraception mandate, even via the accommodation, violates their religious exercise rights.

***The Plaintiffs***

The presidents of Grace Schools and Biola University, Inc. have verified the facts applicable to their claims and request for injunctive relief [DE 54][6]. Both Grace and Biola are not for profit Christ-centered institutions of higher learning. *Id*. at ¶¶ 2, 10-11. To fulfill their religious commitments and duties in a Christ-centered educational context, plaintiffs promote the spiritual and physical well-being and health of their employees and students, which includes the provision of health insurance to their employees and students. *Id*. at ¶¶ 43, 68.

---

[6]The verified complaint serves as the equivalent of an affidavit and, unless specifically noted herein, the defendants do not contest these facts, which are admitted for preliminary injunction purposes. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 542 (7th Cir. 1998). In addition, no hearing was necessary given the controversy was controlled by the undisputed facts detailed in this order.

Grace College and Seminary, located in Winona Lake, Indiana, was founded in 1937 and has a mission to be "an evangelical Christian community of higher education which applies biblical values in strengthening character, sharpening competence, and preparing for service" and pursues its mission through biblically-based programs and services founded in the historic Fellowship of Grace Brethren Churches [DE 54 at ¶¶ 21, 24, 26]. Grace embraces Christian core values, its students, administration, faculty, and staff aim together to make Christ preeminent in all things, *id.* at ¶¶ 22-23, and Grace has a "Covenant of Faith" that is consistent with the beliefs of the Fellowship of Grace Brethren Churches which affirms biblical truth and God's grace. *Id.* at ¶¶ 25, 27. Members of Grace's Board of Trustees, which governs the College, must subscribe annually to the Covenant of Faith, and Grace draws its faculty, staff, and administration from among those who profess the Covenant of Faith. *Id.* at ¶¶ 27-28. Although Grace does not require student membership in the Grace Brethren denomination, it does require a profession of faith as a prerequisite for student admission and students are expected to adhere to the standards set forth in the Grace community and lifestyle statement. *Id.* at ¶ 29. Through its Fall 2013 "Statement on Community Expectations for Faculty and Staff," members of the Grace community agree to uphold the standards of the community, which in pertinent part states:

> Grace Schools values the worth and dignity of human life as expressed through the fruit of the Spirit. Having been made in the image of God, those who live and work at the institution express like faith and are expected to respect and uphold life-affirming practices that distinguish our faith community from other institutions of higher education, particularly for those who are vulnerable members of society. Consistent with the views of the Fellowship of Grace Brethren Churches, Grace Schools believes that human life is worthy of respect and protection at all stages from the time of conception. The sanctity of human life is established by creation (Genesis 1:26-27), social protection (Genesis 9:6) and redemption (John 3:16).

[DE 54 at ¶¶ 36-37]. Further, the Fellowship of Grace Brethren Churches believes that human

life is worthy of protection and respect at all stages from the time of conception (or fertilization), and Grace has the religious view that the procurement, participation in, facilitation of, or payment for abortion (including abortion-causing drugs) violates the Sixth Commandment and is inconsistent with the dignity conferred by God on creatures made in His image. *Id*. at ¶¶ 32-35.

Consistent with its religious commitments, Grace provides a self-insured group plan for its employees, acting as its own insurer but working with a third-party claims administrator [DE 54 at ¶ 44]. Under the terms of Grace's plan for its employees, coverage excludes abortifacient drugs, however, the employee plan does include a variety of contraceptive methods that Grace does not consider to be morally objectionable. *Id*. at ¶¶ 46-47. In addition, Grace requires all registered residential students to have health insurance, and if a student does not submit proof of coverage, Grace will enroll the student in a health insurance plan issued by Gallagher Koster and bill enrolled students for the cost of the coverage. *Id*. at ¶ 50. Grace's student plan does not include coverage for abortifacient drugs and related counseling to which it morally objects. *Id*.

Grace currently has approximately 457 employees and 3,100 students [DE 54 at ¶¶ 30-31]. Approximately 168 employees are enrolled in Grace's group health plan, along with approximately 307 dependents. *Id*. at ¶ 45. In the 2013-2014 school year, approximately 60 students enrolled in the student insurance plan facilitated by Grace. *Id*. at ¶ 50.

Biola University, located in La Mirada, California, was founded in 1908 as the Bible Institute of Los Angeles and has a mission to provide biblically or Christ-centered education, scholarship and service—equipping men and women in mind and character to impact the world for the Lord Jesus Christ [DE 54 at ¶¶ 51-52, 55, 57-60]. Biola's vision is to be an exemplary Christian university and believes that all it does should be Christ-centered. *Id*. at ¶¶ 53, 55.

Biola also believes that God uses its faculty, staff, students, and alumni to accomplish God's plans, and draws its faculty, staff, and students from among those who profess faith in Christ. *Id.* at ¶¶ 56, 61.

Biola's "Doctrinal Statement" declares that "[t]he Bible is clear in its teaching on the sanctity of life. Life begins at conception. We reject the destruction or termination of innocent human life through human intervention in any form after conception including, but not limited to, abortion, infanticide or euthanasia because it is unbiblical and contrary to God's will. Life is precious and in God's hands." [DE 54 at ¶ 65]. The Biola Employee Handbook, in a section entitled "Standard of Conduct," states in part as follows: "Consistent with the example and command of Jesus Christ, we believe that life within a Christian community must be lived to the glory of God, with love for God and for our neighbors . . .[t]o this end, members of the Biola community are not to engage in activities that Scripture forbids. Such activities include . . . the destruction or termination of innocent human life through human intervention in any form after conception including, but not limited to, abortion, infanticide or euthanasia." *Id.* at ¶ 66. In addition, Biola's undergraduate Student Handbook provides in relevant part: "The University wants to assist those involved in unplanned pregnancy while at Biola to consider the options available to them within the Christian moral framework. These include marriage of the parents, single parenthood, or offering the child for adoption. Because the Bible is clear in its teaching on the sanctity of human life, life begins at conception; we abhor the destruction of innocent life through abortion on demand. Student Development stands ready to help those involved to cope effectively with the complexity of needs that a crisis pregnancy presents." *Id.* at ¶ 67.

Biola offers two medical insurance plans to regular employees who work at least 30

hours per week, for at least ten months of the year—one plan is through Kaiser, while the other is through Blue Shield [DE 54 at ¶¶ 69-70]. Biola has approximately 856 full time, benefit-eligible employees, and approximately 1,835 individuals are covered under its two employee health insurance plans. *Id*. at ¶ 71.

Prior to April 1, 2012, the former Anthem Blue Cross plan and the Kaiser plan did cover all FDA-approved contraceptives, but the inclusion of abortion-inducing drugs was neither knowing nor intentional on Biola's part. *Id*. at ¶¶ 73, 75. Since April 1, 2012, the Blue Shield plan has not covered abortion-inducing drugs, but it does provide coverage of other drugs characterized by the FDA as "contraceptives." *Id*. at ¶ 74. Also since April 1, 2012, the Kaiser plan has not covered any contraceptives, but employees can receive coverage of non-abortifacient prescription contraceptive drugs through Script Care, a pharmacy benefits manager. *Id*. at ¶ 75.

Biola requires its students to have health insurance coverage and facilitates health insurance through United Health Care for its students who are not otherwise covered by health insurance [DE 54 at ¶ 76]. While Biola does not indicate the number of students enrolled in its health plan, it currently has approximately 6,323 students. Biola University, Five Year Enrollment Summary 2009-2013 Summary, http://www.biola.edu/registrar/research_ reporting/5_year_enrollment/5_Year_Enrollment_Summary.pdf (last visited Dec. 15, 2013). Students who enroll in the plan pay the premium to Biola and then Biola remits payment to the carrier on behalf of the students [DE 54 at ¶ 76]. Ella and Plan B are excluded from this plan. *Id*.

Although Grace and Biola were protected by the safe harbor which was extended through the end of 2013, their employee and student health plans must comply with the contraception

mandate thereafter, *id.* at ¶¶ 48, 116-18, 150, 179, 181, 275, because plaintiffs do not meet the religious employer exemption and their health plans are not grandfathered. *Id.* at ¶¶ 3, 49, 72, 143-144. Specifically, Grace's employee and student health plans are subject to the contraception mandate on January 1, 2014 and July 25, 2014, respectively, and Biola's employee and student health plans are subject to the mandate on April 1, 2014 and August 1, 2014, respectively. *Id.* at ¶¶ 48, 179, 181. However, the plaintiffs are eligible for the accommodation. *Id.* at ¶ 148.

As plaintiffs profess their religious beliefs, compliance with the accommodation violates their free exercise rights because it forces the plaintiffs to obtain insurance and certify a form that specifically requires an issuer or TPA to provide coverage for the objectionable contraceptive services as a direct consequence of the health benefits provided by the plaintiffs [DE 54 at ¶¶ 5, 133] (claiming that the accommodation forces plaintiffs to deliberately provide health insurance that will trigger[7] access to abortion inducing drugs and related education and counseling). In other words, by invoking the accommodation and executing the self certification, plaintiffs would initiate the insurance coverage of morally objectionable contraceptive services [DE 54 at ¶¶ 152-55]. And by issuing the self certification, the plaintiffs would be identifying their participating employees and students to the TPA/issuer for the distinct purpose of enabling the government's scheme to facilitate free access to abortifacient services, to which plaintiffs would have to continue to play a central role in facilitating. *Id.* at ¶¶ 156-63.

---

[7]Defendants dispute that the regulations require plaintiffs to "trigger" or "facilitate" the provision of contraceptive services to which plaintiffs object; however, defendants acknowledge that this is plaintiffs' characterization of what the mandate requires of them were the plaintiffs to complete the self-certification form and provide a copy of it to their issuer/TPA.

The government contends that even prior to the ACA's passage, Grace and Biola would have had to provide notice to their issuers/TPAs indicating that their insurance plans should exclude coverage for objectionable contraceptive services. However, the government makes the contention without providing any evidence of what type of notice was previously given by plaintiffs to their insurers/TPAs, if any, for the *exclusion* of particular services.

Plaintiffs contend that they strongly believe that God has condemned the intentional destruction of innocent human life and, as a matter of religious conviction, it would be sinful and immoral for them to intentionally participate in, pay for, facilitate, enable, or otherwise support access to abortion or the use of drugs that can (and do) destroy human life in the womb—which the accommodation permits. *Id.* at ¶¶ 2, 175-78. On the other hand, refusing to offer insurance (which plaintiffs allege transgresses their religious duty to provide for the well-being of their employees and students) or refusing to comply with the contraception mandate, would cause them to face enormous fines that would financially devastate their operations and undermine their mission. *Id.* at ¶¶ 7, 179-81.

Plaintiffs also represent that rather than imposing the burden of the accommodation upon them, there are alternative mechanisms through which the government could provide access to the objectionable contraceptive services [DE 54 at ¶¶ 189-92]. For instance, plaintiffs argue that the government could provide contraceptive services through direct government payments, or through tax deductions, refunds or credits. *Id.* at ¶¶ 191-93. Moreover, plaintiffs argue that the government's interests in pursuing the mandate can hardly be compelling or pursued by the least restrictive means where it has excluded millions of employers from the ACA's requirements, including those employers who are grandfathered, 42 U.S.C. § 18011, or have fewer than 50

employees, 26 U.S.C. § 4980H; and where the government has included an exemption from the contraception mandate for those deemed religious employers, 45 C.F.R. § 147.131(a). *Id*. at ¶¶ 194-202. Plaintiffs argue that these broad exemptions further demonstrate that they could also be exempted from the requirements of the contraception mandate without measurably undermining any sufficiently important governmental interest served by the mandate. *Id*. at ¶ 195.

## II. Preliminary Injunction Standard

To obtain a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest. *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Ezell*, 651 F.3d at 694. This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor.[8] *See Planned Parenthood*, 699 F.3d at 972. The aim is to minimize the costs of a wrong decision. *See Stuller,*

---

[8]As an aside, the government noted an objection to applying the sliding scale approach, arguing that the approach is inconsistent with the Supreme Court's holding in *Winter v. NRDC, Inc*., 555 U.S. 7, 20 (2008) requiring a plaintiff to show all of the preliminary injunction factors. But the government also recognized that the undersigned is nonetheless bound to apply the Seventh Circuit's sliding scale approach to an injunction. In fact, the Seventh Circuit has recently determined that its sliding scale approach is "a variant of, though consistent with, the Supreme Court's recent formulations of the standard . . ." *Planned Parenthood of Wisc., Inc. v. Van Hollen*, No. 13-2726, 2013 WL 6698596 (7th Cir. Dec. 20, 2013) (citing *Winter*, 555 U.S. at 20).

*Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).

The appropriateness of a preliminary injunction in this case rests on plaintiffs' RFRA claim and presents the following issues: does the contraception mandate and accommodation provided substantially burden the religious exercise rights of the plaintiffs, and if so, has the government discharged its burden of justifying its regulations under strict scrutiny. Here, plaintiffs have shown some likelihood of success on the merits of their RFRA claim, that no adequate remedy at law exists, and that they will suffer irreparable harm without an injunction. And, a weighing of the injunction equities and consideration of the public interest also strongly supports issuance of an injunction at this stage of the litigation.

### III. Analysis

To begin, for purposes of determining whether a preliminary injunction is appropriate in the instant case, no one questions that the issues presented based on the 2013 final rules are ripe for ruling, that the threat of financial penalty and other enforcement action is sufficient to establish the plaintiffs' standing to challenge the accommodation, and that plaintiffs—nonprofit religious organizations—exercise religion in the sense that their activities are religiously motivated. The Court will thus consider the appropriateness of injunctive relief in the instant case.

#### Success on the Merits of the RFRA Claim

The RFRA prohibits the federal government from placing substantial burdens on "a person's exercise of religion," 42 U.S.C. § 2000bb–1(a), unless it can demonstrate that applying the burden is "in furtherance of a compelling government interest" and is the "least restrictive means of furthering that compelling governmental interest," *id*. § 2000bb–1(b). RFRA creates a

broad statutory right to case-specific exemptions from laws that substantially burden religious exercise even if the law is neutral and generally applicable, unless the government can satisfy the compelling-interest test. *Korte*, 735 F.3d at 671-72 (reasoning that with RFRA, Congress expressly required accommodation rather than neutrality) (citation and quotation marks omitted). RFRA is structured as a "sweeping 'super-statute,' cutting across all other federal statutes (now and future, unless specifically exempted) and modifying their reach." *Id*. at 673 (quoting Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995)).

Once a RFRA claimant makes a *prima facie* case that the application of a law or regulation substantially burdens his religious practice, the burden shifts to the government to justify the burden under strict scrutiny. *Id.* (citing *Gonzales v. O Centro Espirita*, 546 U.S. 418, 428 (2006)). "Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test . . .". *Id*. (citing *O Centro Espirita*, 546 U.S. at 430). Thus, in RFRA litigation, as in First Amendment litigation, "the burdens at the preliminary injunction stage track the burdens at trial." *Id*. (citing *O Centro Espirita*, 546 U.S. at 429).

### 1.    Substantial Burden

While neither the United States Supreme Court nor any Circuit Courts have had the opportunity to consider whether the contraception mandate creates a substantial burden on a non-secular, nonprofit organization's religious exercise rights given the "accommodation" created for

eligible organizations,[9] the Seventh Circuit recently discussed in *Korte* the substantial burden

analysis in the context of RFRA:

> Recall that "exercise of religion" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (emphases added). At a minimum, a substantial burden exists when the government compels a religious person to "perform acts undeniably at odds with fundamental tenets of [his] religious beliefs." *Wisc. v. Yoder*, 406 U.S. 205, 218, 92 S.Ct. 1526 (1972). But a burden on religious exercise also arises when the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425 (1981); *see also Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008). Construing the parallel provision in RLUIPA, we have held that a law, regulation, or other governmental command substantially burdens religious exercise if it "bears direct, primary, and fundamental responsibility for rendering [a] religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). The same understanding applies to RFRA claims.
>
> Importantly, the substantial-burden inquiry does not invite the court to determine the centrality of the religious practice to the adherent's faith; RFRA is explicit about that. And free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious

---

[9]In fact, not many district courts have had the opportunity to consider this question relative to nonprofit religious organizations, and their conclusions vary. Three courts have upheld the accommodation. *See Catholic Diocese of Nashville v. Sebelius,* No. 3:13-01303 (M.D. Tenn. Dec. 26, 2013); *University of Notre Dame v. Sebelius*, No. 3:13-cv-1276-PPS-CAN (N.D. Ind. Dec. 20, 2013) (Simon, C.J.); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 1:13-cv-01261-EGS (D.D.C. Dec. 19, 2013). While the other courts have found the accommodation to pose a substantial burden. *See Geneva College v. Sebelius,* No. 12-0207 (W.D. Pa. Dec. 23, 2013); *Southern Nazarene Univ. v. Sebelius*, No. CIV-13-1015-F (W.D. Okla. Dec. 23, 2013); *Legatus v. Sebelius*, No. 12-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); *Roman Catholic Archdiocese of New York v. Sebelius,* No. 1:12-cv-02542-BMC, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik (and Persico) v. Sebelius*, Nos. 13cv1459 and 13cv0303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013); *Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481 (W.D. Pa. June 18, 2013); *see also Roman Catholic Archbishop of Washington v. Sebelius*, No. 13-1441 (ABJ), 2013 WL 6729515 (D.D.C. Dec. 20, 2013) (drawing a distinction between self insured and group insured plans and granting a preliminary injunction only with respect to a self insured plaintiff despite the fact that all eligible organizations are confronted with the self certification process created by the accommodation).

obligations. *See United States v. Lee*, 455 U.S. 252, 257, 102 S.Ct. 1051 (1982); *Thomas*, 450 U.S. at 715–16, 101 S.Ct. 1425. Indeed, that inquiry is prohibited. "[I]n this sensitive area, it is not within the judicial function and judicial competence to inquire whether the [adherent has] correctly perceived the commands of [his] . . . faith. Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. at 716, 101 S.Ct. 1425. It is enough that the claimant has an "honest conviction" that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion. *Id.*; *see also id.* at 715, 101 S.Ct. 1425 ("Thomas drew a [religious] line, and it is not for us to say that the line he drew was an unreasonable one.").

Checking for sincerity and religiosity is important to weed out sham claims. The religious objection must be both sincere and religious in nature. *Cf. United States v. Seeger*, 380 U.S. 163, 184–86, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (military-conscription exemption applies only to objections based on sincerely held religious beliefs as opposed to philosophical views or a personal moral code). These are factual inquiries within the court's authority and competence. But we agree with our colleagues in the Tenth Circuit that the substantial-burden test under RFRA focuses primarily on the "intensity of the coercion applied by the government to act contrary to [religious] beliefs." *Hobby Lobby Stores, Inc., v. Sebelius*, 723 F.3d 114, 1137 (10th Cir. 2013). Put another way, the substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions.

*Korte*, 735 F.3d at 682-83. With these principles in mind, the Seventh Circuit determined, in relevant part, that it was a substantial burden on the for profit company plaintiffs and their owners to require them to *purchase or provide* the required contraception coverage (or self-insure for these services). *Korte*, 735 F.3d at 668.

In the instant case, the government defendants posit that *Korte* and other similar for profit plaintiff cases, *see, e.g., Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013); *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208 (D.C. Cir. 2013), are distinguishable because the burden on Grace and Biola to comply with the accommodation is merely de minimus where plaintiffs would barely have to modify their behavior by complying with the purely administrative self certification requirement which should take a matter of

minutes. Moreover, the government believes that any burden cast upon Grace and Biola is too attenuated to constitute a substantial burden.

The Court acknowledges that the burden on Grace and Biola to complete and submit a self certification is different than the burden imposed on the *Korte* plaintiffs. Simply put, Grace and Biola are not required "to contract, arrange, pay, or refer for contraceptive coverage" to which it has religious objections, 78 Fed. Reg. 39,874. Rather the plaintiffs must complete a self certification form stating that each is an eligible organization which objects to providing the contraceptive coverage on religious grounds and provide a copy of that self certification to its issuer or TPA, so that the payment for the services can then be provided or arranged for by the issuer or TPA at no cost to Grace or Biola. 45 C.F.R. § 147.131(b); 78 Fed. Reg. 39,874-75. But even so, the Court cannot agree with the government that Biola and Grace have not shown at least some reasonable likelihood of success on the merits relative to the showing of a substantial burden as defined in *Korte.*

According to the Seventh Circuit, the pertinent inquiry for the substantial burden test under RFRA is whether the claimant has an honest conviction that what the government is requiring or pressuring him to do conflicts with his religious beliefs and whether the governmental pressure exerts a sufficiently coercive influence on the plaintiffs' religious practice. *Korte,* 735 F.3d at 683; *see Hobby Lobby*, 723 F.3d at 1137 ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."); *Gilardi*, 733 F.3d at 1217-18 (". . . the burden becomes substantial because the government commands compliance by giving the Gilardis a Hobson's choice. They can either abide by the sacred tenets of their faith, pay a

20

penalty of over $14 million, and cripple the companies they have spent a lifetime building, or they become complicit in a grave moral wrong.").  And in this case, the government defendants concede that plaintiffs' religious beliefs are sincerely held.  In fact, the only evidence before the Court—plaintiffs' undisputed affirmations—indicate that their beliefs are indeed sincere and religious in nature.  Therefore, the government rests its argument on its belief that plaintiffs cannot establish a substantial burden on plaintiffs' religious exercise rights where the regulations do not, according to the government, require the plaintiffs to modify their religious behavior.

Grace and Biola have established that the accommodation compels them to facilitate and serve as the conduit through which objectionable contraceptive products and services are ultimately provided to their employees and students, in violation of their unquestionably sincerely held religious beliefs.  And prior to the ACA's enactment, no evidence establishes that Grace and Biola previously discussed or provided a similar notice to their insurers/TPAs indicating that contraceptive services (specifically) were to be excluded from their health plans. In fact, given the religiously affiliated nature of the plaintiffs and their public stance on abortion and contraception, it is just as likely that those services would not have required any discussion, let alone a self certification, prior to their purchasing insurance coverage. *Cf. University of Notre Dame v. Sebelius*, No. 3:13-cv-1276-PPS-CAN (N.D. Ind. Dec. 20, 2013) ("In sum, the certification merely denotes Notre Dame's refusal to provide contraceptive care—a statement that is entirely consistent with what Notre Dame has told its TPA in the past . . . [and so, the holding] isn't that a compelled action is de minimis. It's that no action is being compelled at all because the action would be taken [by Notre Dame] even if no contraception requirement applied.").

But even if the plaintiffs previously informed their insurers/TPAs not to provide coverage for objectionable contraceptive services, the government's argument relative to the de minimus nature of any burden created by the accommodation is too narrow of a focus. The government's argument, that the completion of a simple self certification form that takes minutes doesn't create a substantial burden, misses the point. It is not the mere filling out and submitting the certification that creates a burden. Rather, if plaintiffs choose to provide health insurance coverage for employees and students (to comply with their own religious tenants and to avoid the ACA's fines for failing to meet coverage requirements), then they must either directly provide contraceptive services themselves (which are clearly contrary to their religious beliefs) or they must invoke the accommodation and facilitate, indeed in their mind enable, the availability of contraceptive services (which is also contrary to their sincerely held religious beliefs). Thus, although plaintiffs avoid paying for the services, the compulsion to offer group health insurance results in their direct facilitation of insurance coverage and the potential use of contraceptive services by their employees and students, services which plaintiffs morally oppose. That the accommodation scheme allows the plaintiffs to avoid the costs of such services provides no comfort or relief. It's the facilitation of the objectionable services, not the related cost, that offends their religious beliefs. Ultimately, the plaintiffs would be forced to modify their behavior *and* violate their religious beliefs by either giving up their health insurance plans or by providing insurance but taking critical steps to facilitate another's extension of the objectionable coverage. *See Korte*, 735 F.3d at 682-83; *see also Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481 (W.D. Pa. June 18, 2013) (citing *Thomas*, 450 U.S. at 718). And, their failure to comply with insurance requirements or provide contraceptive services results in

enormous penalties that would be financially detrimental to their operations.  In short, the

government's accommodation results in the plaintiffs violating their sincerely held religious

beliefs, as well as the choice between conformity with the ACA's requirements or face

substantial fines. *See Korte*, 735 F.3d at 683; *see also Southern Nazarene Univ. v. Sebelius*, No.

CIV-13-1015-F (W.D. Okla. Dec. 23, 2013) (DE 45 at 16) ("The self certification is, in effect, a

permission slip which must be signed by the institution to enable the plan beneficiary to get

access, free of charge, from the institution's insurer or third party administrator, to the products

to which the institution objects. If the institution does not sign the permission slip, it is subject to

very substantial penalties or other serious consequences. If the institution does sign the

permission slip, and only if the institution signs the permission slip, institution's insurer or third

party administrator is obligated to provide the free products and services to the plan

beneficiary.").  Thus, given the nature of the analysis utilized, the undersigned believes that

*Korte* may logically be extended to conclude that the completion and submission of the self

certification is an alteration in plaintiffs' behavior such that it constitutes a substantial burden

under RFRA. *See University of Notre Dame*, No. 3:13-cv-1276-PPS-CAN ("Perhaps upon

review of this case, *Korte* will be extended by the Seventh Circuit to say that the filing of a

certification is an alteration in Notre Dame's behavior such that it constitutes a substantial

burden under RFRA"); *see also Zubik (and Persico) v. Sebelius*, Nos. 13cv1459 and 13cv0303,

2013 WL 6118696, at *23-25 (W.D. Pa. Nov. 21, 2013) ("although the 'accommodation' legally

enables Plaintiffs to avoid directly paying for the portion of the health plan that provides

contraceptive products, services, and counseling, the "accommodation" requires them to shift the

responsibility of purchasing insurance and providing contraceptive products, services, and

counseling, onto a secular source. The Court concludes that Plaintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially burdens their sincerely-held religious beliefs."). Given *Korte's* guidance, the lack of mandatory authority on the precise issue at hand, and the divergence of case holdings demonstrating the difficulty of the issue and the uncertainty of the ultimate decision on the merits, the Court believes that plaintiffs have shown at least some reasonable likelihood of success on the merits relative to the substantial burden analysis. And even if that likelihood was just more than slight, the balance of harms could support injunctive relief.[10]

Before concluding the substantial burden analysis, the undersigned would be remiss if it didn't acknowledge the government's alternative argument, that any burden on plaintiffs' religious exercise is too attenuated to render it substantial. In summary, the government believes that because plaintiffs are not required to actually contract or pay for contraceptive coverage any burden is too attenuated to be substantial because plaintiffs are separated by a series of events that must occur before the objectionable contraceptive services would be utilized. Specifically, after receiving the certification from plaintiffs, the TPA or issuer would actually pay for or arrange payment for the contraceptive services should employees and students independently decide to even use those services.

Similarly, in *Korte*, the government argued that the contraception mandate's burden was

---

[10]*See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 315 (7th Cir. 1994) ("Once the district court determined that [plaintiff's] likelihood of success on the merits of its claim was slight, it required [plaintiff] to make a proportionately stronger showing that the balance of harms was in its favor.") (citing *Accord Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

insubstantial because any use of contraceptive services could not be attributed to the corporate plaintiffs or their owners since the provision of the contraceptive coverage was several steps removed from an employee's independent determination to use contraception. *See Korte*, 735 F.3d at 684. However, the Seventh Circuit's majority opinion reasoned that the government's attenuation argument is equivalent to improperly asking whether "providing this coverage impermissibly assist[s] the commission of a wrongful act in violation of the moral doctrines of the [plaintiffs' religion]." *Id.* at 685.[11] But, "[n]o civil authority can decide that question". *Id.*; *see Roman Catholic Archdiocese of New York,* No. 1:12-cv-02542-BMC, 2013 WL 6579764, at *14 ("The Government feels that the accommodation sufficiently insulates the plaintiffs from the objectionable services, . . . [but] it is not the Court's role to say that plaintiffs are wrong about their religious beliefs."); *see also Hobby Lobby,* 723 F.3d at 1142 (the question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity).

Here, no one questions that among the plaintiffs' religious tenets is that life begins at conception and that providing all FDA approved contraceptive service violates those tenets. And so it follows that plaintiffs object to deliberately providing health insurance that will trigger access to objectionable contraceptive services and related education and counseling. By completing the self certification, plaintiffs sincerely believe that they will be facilitating, and actually supporting, a step in the process by which their employees and students will eventually secure access to free contraceptive services. In their minds, this makes them complicit in the

---

[11]Judge Rovner understood the majority to be rejecting any assessment on how direct or attenuated the burden imposed on the plaintiff's religious practices may be. *Korte,* 735 F.3d at 705 (Rovner, J., dissenting).

provision and use of such services. Again, the government does not contest the sincerity of these beliefs. Because Grace and Biola hold these honest religious convictions and because failing to comply with the law will result in heavy financial penalties and the risk of enforcement actions (which will significantly impact their ability to provide religious services), *id*. at 683, plaintiffs have shown that the contraception mandate and accommodation constitute a substantial burden on their religious exercise. As a result, the government must justify its regulations under the compelling interest test.

### 2. Least Restrictive Means and Compelling Government Interest

RFRA requires the government to demonstrate that applying the contraception mandate and its accommodation are "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b). Again, the Court follows the precedent set forth in *Korte*, in applying the appropriate test in this context. In fact, the government has since conceded that the recent decision in *Korte* forecloses its arguments that the regulations satisfy strict scrutiny, even in this context [DE 81 at 2, fn. 1]. Regardless, the Court will conduct an analysis for completeness of the record.

Consistent with *Korte*, the Supreme Court has instructed courts to look beyond "broadly formulated interests justifying the general applicability of government mandates" and "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Korte*, 735 F.3d at 685 (citing *O Centro Espirita*, 546 U.S. at 431). In other words, under RFRA's version of strict scrutiny, the government must establish a compelling and specific justification for burdening these claimants. *Id*.

The compelling-interest test generally requires a "high degree of necessity." *Id*. (citing

*Brown v. Entm't Merchs. Ass'n*, — U.S. — , 131 S.Ct. 2729, 2741 (2011)). The government must "identify an 'actual problem' in need of solving, and the curtailment of [the right] must be actually necessary to the solution." *Id*. (citing *Brown,* 131 S.Ct. at 2738). In the free-exercise context, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id*. (citing *Yoder*, 406 U.S. at 215). "[I]n this highly sensitive constitutional area, only the gravest abuses, endangering paramount interests, give occasion for permissible limitation . . .". *Id.* (citing *Sherbert*, 374 U.S. at 406). The regulated conduct must "pose[ ] some substantial threat to public safety, peace[,] or order." *Korte*, 735 F.3d at 686 (citing *Sherbert*, 374 U.S. at 403). Finally, "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (7th Cir. 1993)).

Similar to the interests claimed by the government in *Korte*, the government identified two legitimate public interests in the instant case, improving the health of women and newborn children and equalizing the provision of preventive care for women and men so that women can participate in the workforce and society on an "equal playing field with men." The government (prior to the issuance of *Korte*) had argued that the contraception mandate and the accommodation furthers these interests in a narrowly tailored fashion by not requiring nonprofit religious organizations with religious objections to providing contraceptive coverage to contract, pay, arrange, or refer for that coverage.

The Court agrees that the government's stated interests are indeed important, and for the sake of argument (and a thorough analysis) will assume they are even compelling. However, the

government has not shown that the contraception mandate employs the least restrictive means of furthering the government's interests, because strict scrutiny requires a substantial congruity—a close "fit"—between the governmental interest and the means chosen to further that interest. *Korte*, 735 F.3d at 686.

As discussed, the regulatory scheme exempts or excludes certain employers from the contraception mandate and does not apply the ACA's requirements to employers with grandfathered plans or those with less than 50 employees. Since the government grants so many exceptions already, it cannot legitimately argue that its regulations are narrowly tailored, nor can they argue against exempting these plaintiffs, amounting to less than 2,000 covered people (or 1,500 eligible employees and a combined student population of less than 10,000). *See Korte*, 735 F.3d at 686; *Gilardi*, 733 F.3d at 1222 ("underinclusiveness can suggest an inability to meet the narrow-tailoring requirement, as it raises serious questions about the efficacy and asserted interests served by the regulation"). Also, there is nothing to suggest the ACA would become unworkable if employers objecting on religious grounds could opt out of one part of a comprehensive coverage requirement. *See Gilardi*, 733 F.3d at 1223-24.

Further, the government's reason for creating the religious employer exemption in particular was that houses of worship and their integrated auxiliaries are more likely than other employers to employ people of the same faith who share the same objection to contraceptive coverage, and who would be less likely than others to use contraceptive services even if such services were covered. *See* 78 Fed. Reg. 39,874. However, *these* plaintiffs have indicated that their employees and students are expected to uphold the universities' standards in treating human life as worthy of respect and protection at all stages from the time of conception and are

expected to avoid a Sixth Commandment violation by procuring, participating in, facilitating, or paying for objectionable contraceptive services. Thus, *these* plaintiffs share the same legitimate claim to the free exercise of religion as those exempted as "religious employers." And yet, *these* plaintiffs have not received the same exemption as "religious employers" from having to facilitate or initiate the provision of objectionable contraceptive services, merely because they are not organized and operated as a nonprofit entity referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986—a basis which has nothing to do with the government's stated interests for imposing the requirements of the contraception mandate. *See Zubik*, 2013 WL 6118696 at *29 (noting that the religious employer exemption was not predicated on the government's stated interests). And so again, even assuming the government's interests are compelling, there is no basis indicating the government would be unable to enforce its legislation simply because these plaintiffs could avoid compliance with the contraception mandate.

Finally, there are certainly other ways to promote public health and gender equality less burdensome on religious liberty, and the government has not carried its burden of demonstrating that it cannot achieve its policy goals in ways less damaging to religious-exercise rights. Pre-*Korte*, the government maintained that the accommodation provides the least restrictive means because the self certification requires the plaintiffs to act just as they would without the mandate—by informing their TPAs or insurers that coverage should not include certain contraceptive services. But the argument falls short. First, there is no evidence that plaintiffs so informed their TPA/insurers to exclude such services prior to the ACA. Second, the government has made exemptions from the coverage requirements for other employers without requiring the same form of self certification (and resulting consequences), despite the fact that plaintiffs share

the same legitimate claim to the free exercise of religion as those exempted as religious employers. Third, the self certification process created in the accommodation essentially transforms a voluntary act that plaintiffs may have utilized to ensure that the objectionable services are not provided, consistent with their religious beliefs, into a compelled act that they sincerely believe provides and promotes conduct that is forbidden by their religious beliefs. *See Roman Catholic Archdiocese of New York,* No. 1:12-cv-02542-BMC, 2013 WL 6579764, at *14. And so the nature of the act itself has changed, not merely the consequences of that act.

And as identified in *Korte* and as offered by plaintiffs in the instant action, there are many ways to increase access to free contraception without doing damage to the religious-liberty rights of conscientious objectors. For instance, the government can provide a "public option" for contraception insurance; it can give tax incentives or grants to contraception suppliers to provide these medications and services at no cost to consumers; and it can give tax incentives to consumers of contraception and sterilization services—all without requiring plaintiffs to self certify their religious objections to the contraception mandate and thereby directly facilitate access to objectionable contraceptive services to be arranged or paid for by third parties. Simply because these options may make it more difficult for the government to administer the regulations in a manner that would achieve the government's stated interests, greater efficacy does not equate to the least restrictive means. *See Zubik*, 2013 WL 6118696 at *23. And as the government has conceded in the instant case, *Korte* has recently made clear that its regulations fail the strict scrutiny analysis.

Bearing in mind that at this stage the court need not be certain about the outcome of the case to grant a preliminary injunction, the Court concludes the plaintiffs have shown some

reasonable likelihood of success on the merits relative to their RFRA claim. *See S.E.C. v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995) ("The case is before us on an appeal from the grant of a preliminary injunction, and as is too familiar to require citation such a grant is proper even if the district judge is uncertain about the defendant's liability.").

***Adequate Remedy at Law and Irreparable Harm***

Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and "in First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor.'" *Korte*, 735 F.3d at 666 (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004))). "This is because the 'loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury . . .'. " *Korte*, 735 F.3d at 666 (citing *Alvarez*, 679 F.3d at 589 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Furthermore, injunctions are especially appropriate in the context of first amendment violations because the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Alvarez*, 679 F.3d at 589 (citing *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)).

In the instant case, Grace must decide by December 31, 2013 whether or not to provide insurance coverage and sign the self certification with respect to its employee health plan, and less than three months later Biola must also make the same decisions. Should plaintiffs fail to comply with the insurance coverage requirements of the ACA and its contraception mandate, the plaintiffs face financially devastating fines and enforcement actions. Thus, plaintiffs will be irreparably harmed if forced to forgo their religious beliefs by facilitating access to the objected to services in order to avoid detrimental fines, and there simply is insufficient time to litigate the

merits of the plaintiffs' claims without the relief of a preliminary injunction. Given that plaintiffs' religious exercise rights are at stake in the immediate future, that a loss of these freedoms for even a minimal period of time unquestionably constitutes irreparable injury which cannot be prevented or fully rectified by waiting for a final judgment, *see Elrod*, 427 U.S. at 373; *Anderson v. U.S.F. Logistics (IMS), Inc.*, 274 F.3d 470, 478 (7th Cir. 2011), and that injunctions are designed to offer relief when legal remedies are inadequate to protect the parties' rights, *see Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 397 (7th Cir. 1984) (Swygert, J., dissenting), the Court concludes that these factors weigh strongly in favor of granting the requested relief.

### *Weighing the Equities and Public Interest*

In weighing the equities, the court balances each party's likelihood of success against the potential harms. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). To do so, the court compares the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted. *Id.* (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). We evaluate these harms using a sliding scale approach. *Id.* (citing *Ty, Inc.*, 237 F.3d at 895). The more likely it is that plaintiffs will win their case on the merits, the less the balance of harms need weigh in their favor. *Id.* (citations omitted). Conversely, if it is very unlikely that plaintiffs will win on the merits, the balance of harms need weigh much more in plaintiffs' favor. *Id.* (citations omitted). When conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the

preliminary injunction on nonparties to the litigation. *Id.* (other citations omitted). This analysis is "'subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1100 (citations omitted).

As the Court has previously detailed herein, the harm likely to be caused the plaintiffs without an injunction is imminent and irreparable, whereas the government likely faces no risk of harm, let alone irreparable harm, if the preliminary injunction is granted. The Court agrees with the district court's comments in *Zubik*, in that the combined nationwide total of the millions of Americans whose employers fall within some type of exclusion, exemption, or plan grandfathered from the ACA and contraception mandate's requirements demonstrates that the government will not be harmed in any significant way by the exclusion of these few plaintiffs. *Zubik*, 2013 WL 6118696 at *34; *see also Geneva College v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481, *10 (W.D. Pa. June 18, 2013) ("tens of millions of individuals . . . remain unaffected by the mandate's requirements"). Moreover, the government has itself delayed the enforcement of the contraception mandate by initially granting a safe harbor from its enforcement and agreeing to injunctions in other cases involving challenges to the mandate.

Additionally, granting the preliminary injunction furthers the public interest. While it is true that employees and students of the plaintiffs will face an economic burden not shared by employees and students of organizations that cover all of the contraceptive methods imposed by the mandate, plaintiffs have already established that their employees and students were not only informed of the universities' religious stance regarding contraception and abortion, but they were on notice of the universities' expectation that its employees and students would promote the

universities' religious views and community standards by refraining from the procurement, participation in, facilitation of, or payment for objectionable contraceptive services. [12] With that said, the plaintiffs' employees/students and the public is best served if the plaintiffs can continue to provide needed (and expected) educational services, and the needed (and expected) insurance coverage to its employees and students, without the threat of substantial fines for noncompliance with the contraception mandate and its accommodation. Moreover, injunctions protecting First Amendment freedoms are always in the public interest, *see Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), and the Court sees no reason to make an exception here.

The Court would also note that Grace and Biola quickly filed an amended complaint and sought an injunction after the 2013 final rules were passed. Thus, there has been no delay in their pursuit of a preliminary injunction. *See Ty, Inc.*, 237 F.3d at 903 (a delay in pursuing a preliminary injunction may raise questions regarding irreparable harm.) Additionally, Grace and Biola have established that their employees and students were made aware of the universities' expectation that they were to promote the universities' religious views and community standards by refraining from the procurement of, participation in, facilitation of, or payment for objectionable contraceptive services. Thus, it cannot be said that there was any expectation that the universities would ever facilitate access to all FDA approved contraceptive services for its employees and students. Undoubtedly, the balance of harms in this case weighs heavily in plaintiffs' favor, enough so that any weakness in the merits of their case is overcome, thereby making injunctive relief appropriate to maintain the status quo until a decision on the

---

[12]The government contends that not every employee and student of the plaintiffs share the plaintiffs' religious objections to certain contraceptive services. And while this *may* very well be true, it does not negate the fact that said employees and students were aware of the universities' expectations with respect to their use of contraceptive services.

merits of the case is rendered. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765, 783 (7th Cir. 2011) ("The preliminary injunction, after all, is often seen as a way to maintain the status quo until merits issues can be resolved at trial. By moving too quickly to the underlying merits, the district court required too much of the plaintiffs . . .").

## IV.  Conclusion

Accordingly, it is hereby ORDERED that plaintiffs Grace Schools and Biola University, Inc.'s motion for a preliminary injunction [DE 55] based upon the uncontested and verified allegations of their first amended complaint [DE 54] is GRANTED, and as a result, defendants, their agents, servants, officers, employees, representatives, and all persons in active concert or participation with them are hereby ENJOINED from:

> Applying or enforcing against Plaintiffs Grace Schools and Biola University, Inc. or their employee or student health insurance plans, including their plan brokers, plan insurers, or third party administrators, the requirements set out in 42 U.S.C. § 300gg-13(a)(4) and 45 C.F.R. § 147.130(a)(1)(iv), corresponding guidelines, and corresponding press releases to provide, pay for, or otherwise facilitate access to coverage for FDA approved contraceptive methods, abortion-inducing drugs, sterilization procedures, and related patient education and counseling.

It is further ORDERED that plaintiffs shall not be required to post bond; however, should circumstances change prior to the Court's making a determination on the merits of the case, including new developments in the law, which may make the preliminary injunction or its terms no longer appropriate, then counsel are free to file a motion seeking a modification or vacatur of

the injunction.

SO ORDERED.

ENTERED:  December 27, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court